# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 8, 2011

## STATE OF TENNESSEE v. JOSHUA LEE BROWN

**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-708    Seth W. Norman, Judge**

---

**No. M2010-00437-CCA-R3-CD - Filed September 28, 2011**

---

The Defendant, Joshua Lee Brown, was found guilty by a Davidson County Criminal Court jury of two counts of felony murder; attempted first degree murder, a Class A felony; and attempted especially aggravated robbery, a Class B felony. See T.C.A. §§ 39-13-202 (2006) (amended 2007), 39-12-101 (2010), 39-13-403 (2010). He was sentenced to life imprisonment without the possibility of parole for each of the felony murder convictions, to twenty years' confinement for attempted first degree murder, and to ten years' confinement for attempted especially aggravated robbery. The attempted first degree murder conviction was ordered to be served consecutively to the remaining convictions, for an effective sentence of life plus twenty years. On appeal, he contends that (1) the trial court erred by denying his motion to redact a portion of the video evidence; (2) the trial court erred by denying his motion to strike the State's notice of intent to seek a sentence of life imprisonment without the possibility of parole; (3) the trial court erred by denying his motion to strike the felony murder aggravating circumstance from the State's notice of intent to seek a sentence of life imprisonment without the possibility of parole; (4) the trial court erred by granting the State's request to augment the pattern jury instruction on the "heinous, atrocious, and cruel" aggravating circumstance; (5) the trial court erred by rejecting his requested sentencing instruction regarding the statutory mitigating circumstance that he acted under the substantial domination of another person; (6) his rights to due process and a fair trial were violated when the trial court failed to give the jury meaningful guidance or directions as to their deliberations during the punishment phase of the trial; (7) the trial court erred by imposing partially consecutive sentences; and (8) the evidence was insufficient to establish the "heinous, atrocious, and cruel" aggravating circumstance as to one of the victims during sentencing. We conclude that although the trial court erred when giving a special jury instruction, the error was harmless in light of the whole record. Furthermore, we conclude that although the evidence was insufficient to establish an aggravating circumstance and the trial court failed to make the necessary findings when imposing consecutive sentences, the sentences imposed were appropriate. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

C. Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant District Public Defender (on appeal); and J. Michael Engle and Joan A. Lawson, Assistant District Public Defenders (at trial), for the appellant, Joshua Lee Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Thomas Thurman, Dina Shabayek, and Jeff Burks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to an attempted robbery of an AMPM Discount Tobacco shop during which two store employees, Salama Estfanous and Bishouy Hanna, were killed and one customer, James Rayburn, was shot. At the trial, Mr. Rayburn testified that he was shopping at AMPM Discount Tobacco on December 12, 2006, at approximately 9:15 p.m. He said that he was a frequent customer at the store and that as he joked with Mr. Estfanous and Mr. Hanna, two masked persons entered the store, one carrying a shotgun and the other carrying a pistol. Everyone in the store was ordered to the ground, and the person holding the pistol fired it into the air. Mr. Rayburn said that the persons asked Mr. Estfanous for money and that when Mr. Estfanous stated he did not understand English, the person with the shotgun shot Mr. Estfanous. He said that after Mr. Estfanous was shot, one of the masked persons stated they would kill everyone in the store. Mr. Rayburn said they shot him in the back as he lay face down on the ground and shot Mr. Hanna in the stomach as he lay on the ground. He said the person with the pistol approached him, placed the gun to his head, and pulled the trigger. He said he heard the pistol "click." He said that he was able to call 9-1-1 after the persons left the store and that the police arrived a few minutes later.

Mr. Rayburn testified that he was taken to the hospital but that he did not know how long he remained there because he fell into a coma. He had four surgeries, including having his colon and portions of his intestines removed. He said that the injury caused him daily problems and that although he was formerly self-employed, he received disability benefits at the time of the trial.

On cross-examination, Mr. Rayburn testified that he immediately dropped to the floor when instructed to do so by the masked persons. He agreed he was face down on the floor during the robbery. He agreed that although he saw one person with a shotgun and the other

with a pistol when they entered the store, he was not able to see what occurred after he dropped to the floor. He agreed that several shots were fired from both weapons, that the person with the pistol went behind the counter, and that the person with the shotgun remained in front of the counter. He agreed that he was not asked for money and that nothing was taken from him. He said that during the robbery, a customer lay on the floor near the potato chips.

Frederick Cowan testified that he was in the AMPM Discount Tobacco shop on December 12, 2006, at approximately 9:15 p.m. He said that as he bought potato chips, a man with a sawed-off shotgun forced him to the ground. He said that a shot was fired at his head as he dropped to the ground but that the shot missed. Although he could not see the faces of the persons who attempted to rob the store, he heard them ask the store clerk for money. He said he spoke with the police and gave them a statement that night.

On cross-examination, Mr. Cowan agreed that two persons entered the store, one with a sawed-off shotgun and the other with a handgun. He did not know if the person with the handgun ordered people to the ground. He agreed that the entire encounter happened quickly and that he heard a lot of yelling and shooting. On redirect examination, Mr. Cowan testified that the man with the shotgun pointed the gun at his face and ordered him to the ground.

Metro Police Officer Dewan Daniels testified that he responded to a robbery and shooting at the AMPM Discount Tobacco shop on December 12, 2006. He saw two men on the floor near the cash register. Both men had been shot and one was not breathing. Another man who had been shot was on the ground behind the register and was not breathing.

Mohab Khamis testified that in 2006, he owned the AMPM Discount Tobacco shop located at 342 North Gallatin Road in Madison, Tennessee. He said seven security cameras were located throughout the store. He drove to his store after being told of the shootings and gave the police the recordings of the shootings. He said that the recordings showed the masked persons touching the cash register and that he gave the register to the police to allow them to obtain fingerprints from it. He said nothing was taken from his store during the robbery.

Metro Police Officer Christopher Brennan testified that he arrived at the scene around 9:40 p.m. on December 12, 2006. He said that when he entered the store, he saw one victim on the floor near the counter, one being treated by paramedics, and another behind the counter. He collected cartridge casings and spent shotgun shells from near the victims and photographed the scene. He identified photographs of the scene and items he recovered. He and the detectives at the scene watched the video recordings of the shootings and took the store's cash register to the police department for fingerprinting.

On cross-examination, Officer Brennan agreed that the store had seven surveillance cameras and that the cameras were clearly visible to anyone entering the store. He identified a photograph of the area near the cash register and agreed that money was on the counter and that money filled two containers beneath the register. On redirect examination, Officer Brennan testified that both of the store's cash registers were taken to the police department for processing.

Metro Police Officer William Kirby testified that he worked in the identification section of the police department and that he helped process evidence taken from the AMPM Discount Tobacco shop. He said he was able to obtain fingerprints from a cash register. He said that he watched the surveillance video after recovering the prints and that the video showed one of the masked persons touching the register in the same area where he recovered the prints. He submitted the prints to the Metro Police Department latent fingerprint examination section for analysis. He said he also examined a pair of pants and Reebok tennis shoes to determine if blood was present. He said that one of the shoes contained two spots that appeared to be blood and that he swabbed the spots and submitted the swabs to the police department's property room.

On cross-examination, Officer Kirby testified that the pants submitted were a dark color and did not appear to have blood on them. He said that he did not do further testing of the pants and that he instructed a detective to submit the pants to the Tennessee Bureau of Investigation (TBI) laboratory for testing. He said his role in the investigation was to collect evidence, not analyze it. He did not know if the tennis shoes were sent to the TBI laboratory for testing.

Metro Police Detective Harold Dean Haney testified that he investigated the December 12, 2006 shootings at the AMPM Discount Tobacco shop, but that Detective Mike Roland was the lead detective in the investigation. He was called to the scene at approximately 10:00 p.m. and spoke with witnesses at the scene. He viewed the security footage from the store and learned that the suspects touched the cash register and did not wear gloves. He said that the security footage was edited and placed on a CD but that nothing was changed except the duration of each camera's recording. The CD was played for the jury and showed each of the seven camera angles recorded within the store as the shootings occurred.

Detective Haney testified that the Defendant became a suspect after Officer Kirby submitted the fingerprints lifted from the cash register for analysis. A warrant was issued for the Defendant's arrest, and he was arrested on December 13, 2006. Detective Haney said that the Defendant ran as the police approached the Defendant's home but that the Defendant was quickly captured, arrested, and transported to the police department for questioning.

Robin Betts and Rokisha Alderson were also arrested at the Defendant's home and taken to the police department for questioning. Detective Haney said that the Defendant's family was present at the home and that he received consent to search the home and a Ford Explorer parked in front of the home.

Lorita Marsh, an expert in the field of fingerprint analysis, testified that she was a certified latent fingerprint examiner for the Metro Police Department. She said she entered the two latent fingerprints that were recovered from the cash register into an automated fingerprint identification system to determine possible matching candidates. She said that the Defendant was the top candidate on the list and that she compared the Defendant's known fingerprints with the latent fingerprints submitted by Officer Kirby. She said that her analysis revealed the two prints taken from the register were the Defendant's left index and left middle fingerprints and that her finding was verified by her supervisor, Julia Hooper.

On cross-examination, Ms. Marsh agreed that she examined numerous fingerprints recovered from the scene in addition to those found on the cash register. She agreed she was unable to match some of the prints to any particular person. She said only two of the latent fingerprints matched known prints, those of the Defendant. On redirect examination, Ms. Marsh agreed that she compared the known fingerprints of Rokisha Alderson with the latent prints found at the scene and that she did not find a match.

Metro Police Detective Cody O'Quinn testified that he observed the autopsies of the victims on December 13, 2006. He said he received the buckshot pellets and other projectiles recovered from the victims. He said projectiles were recovered from Mr. Estfanous's spine, back, left lung, and neck. He said that glass was recovered from Mr. Hanna's abdomen and chest and that projectiles and shotgun wadding were recovered from Mr. Hanna's chest and back. He submitted the items to the Metro Police Department property room and then transferred the items to the police department laboratory.

Metro Police Detective Danny Satterfield testified that he assisted Detective Roland's investigation of the shootings that occurred at the AMPM Discount Tobacco shop. He said that he went to Vanderbilt Hospital to check on Mr. Rayburn and that the surgical pathology unit gave him a bullet recovered from Mr. Rayburn.

Metro Police Sergeant Chris Steele testified that he assisted in the Defendant's arrest. He said the police were given consent to search the Defendant's home and a Ford Explorer in front of the home. He said that he saw ski masks and dark clothing on the back seat of the Explorer and that Officer Thomas Simpkins gathered the items. On cross-examination, Sergeant Steele agreed that the Explorer sat directly in front of the home and that the ski masks and clothing could be seen through the windows easily.

Metro Police Officer Thomas Simpkins testified that he worked in the identification section of the police department and that he gathered evidence from the home where the Defendant was arrested and an Explorer in front of the home. He identified pictures of the home and items the police recovered. He identified two knit caps and said he obtained one from the front seat of the Explorer and the other from the console. He said that within the home, he recovered a jacket with fur lining, a black jacket, black pants, a black sweater, a blue shirt, and shoes. He identified the items.

On cross-examination, Officer Simpkins agreed that he did not search the home or the Explorer and that he collected and photographed evidence as instructed. He said some of the items were removed from the Explorer and placed on the ground before he photographed and collected them. He said the ski masks were in the front seat when he arrived at the home and agreed they could cover a person's face. He agreed that a photograph of the living room showed the shoes he recovered and a bicycle.

Metro Police Detective Mike Roland testified that he was the lead detective investigating the shootings. He said that Mr. Hanna's and Mr. Estfanous's bodies were still at the store when he arrived and that they were taken to the medical examiner's office. He said the police arrested the Defendant after finding the Defendant's fingerprints on the store's cash register. Robin Betts, who was eighteen years old, and Rokisha Alderson, who was sixteen years old, were also taken to the police department for questioning. He said Mr. Betts and Ms. Alderson admitted their involvement in the shootings at the tobacco shop. He said the Defendant was informed of his constitutional rights and appeared to understand his rights before he gave a video recorded statement. He identified the Defendant's recorded statement and a transcript of the recording. The recording was played for the jury.

In the video recording, Detective Roland informed the Defendant of his constitutional rights, including his right to remain silent and his right to an attorney. The Defendant stated that he understood his rights and signed a waiver of his rights. Detective Roland told the Defendant that the police had evidence indicating the Defendant was involved in a homicide the night before and asked the Defendant why he did it. The Defendant replied, "Stress and mental . . . problems" caused by not taking his medication. He said that two or three years earlier, he stopped taking his medication for depression and "mental problems." The Defendant stated that he rode to the tobacco shop with Buddy Robinson, who was his cousin, and that robbing the store was Mr. Robinson's idea. He said he had never been involved in a previous robbery. He said that although he initially told Mr. Robinson he did not want to be involved in the robbery, "my mind just went blank and just got out of the truck and went in there and told him to come on with the money." He said that he ordered the people to the ground, that Mr. Robinson asked the clerk for money, and that the clerk refused. He said that after Mr. Robinson fired the first shot, "I said naw, then went on and shot the man who was

-6-

on the ground once. Then when I shot the other shot, I didn't know who the other shot hit, I just shot it at the ground. I guess the bullet shots spread and hit the man . . . ." The Defendant said that he purchased the shotgun he used during the robbery from a man on the street and that he gave "powder" to a woman named Camry in exchange for the truck he used during the robbery. He said that he wore a black shirt, a gray "hoodie," and a ski mask during the robbery and that Mr. Robinson wore a grey shirt, black pants, and a jacket with fur around the hood. When Detective Roland disputed the Defendant's version of the robbery, the Defendant ended the interview.

Detective Roland testified that the Defendant lied when he said Buddy Robinson was involved in the crime. He said that the recording of the shooting showed the Defendant wearing blue jeans with white lettering during the robbery but that the jeans were not found at the Defendant's home or in the Explorer. He said the police collected projectiles and shotgun shell casings from the scene, one bullet recovered from Mr. Rayburn at Vanderbilt Hospital, and projectiles recovered from the victims by the medical examiner. He identified swabs taken from the Reebok tennis shoes found in the Defendant's home and said the swabs were sent to the TBI laboratory for testing. He said that he also asked the medical examiner to take samples of the victims' blood for comparison to blood found on the evidence recovered from the Defendant's home and the Explorer and that the medical examiner provided the samples to the TBI laboratory.

On cross-examination, Detective Roland agreed that a large amount of cash sat in a basket directly beneath the cash register at the tobacco shop, but he did not know the amount. He agreed his investigation revealed that the person holding the pistol fired the first shot. On redirect examination, Detective Roland agreed the money beneath the register was pulled forward to be photographed and said the money was originally in a position that was not easily seen.

TBI Agent Steve Scott, an expert in firearms identification, testified that he was a forensic scientist with the firearms identification unit. He said that although most bullets and shell cases could be matched to the weapon that fired them, shotgun pellets could not normally be matched to a certain weapon because shotgun barrels were smooth and did not contain identifying marks that could be imparted to the shotgun pellets. He said the .38 caliber bullets recovered from the scene and from Mr. Rayburn at Vanderbilt Hospital were fired from the same gun. He said the .38 caliber bullets had hollow points, which created more tissue damage upon impact. He said that he examined eighteen double-aught buckshot pellets submitted by the medical examiner's office and that the pellets were consistent with the two shotgun shell cases he examined.

TBI Agent Patrick Ihrie testified that he was a forensic scientist with the serology and DNA unit. He said that serology was the identification of body fluids and that unknown samples of fluids could be compared to and matched with known samples. He said that the Metro Police Department asked him to compare a swab and scrapings taken from a Reebok tennis shoe with blood samples taken from Mr. Estfanous and Mr. Hanna. He said that the swab taken from the Reebok tennis shoe matched Mr. Hanna's DNA profile and that the chance of a random match occurring was less than one in 134 million.

On cross-examination, Agent Ihrie testified that although he saw a picture of the Reebok tennis shoes, he never saw the actual shoes. He was not aware of any TBI policy requiring analysis of the original source of evidence, as opposed to a sample taken from the original source. He agreed he used a database maintained by the Federal Bureau of Investigation to generate DNA statistics and said he did not think any Egyptians were included in the database. He said that the statistics provided information on how common a DNA profile was within a given population and that the numbers were generally similar across different populations. On redirect examination, Agent Ihrie testified that genetic markers differed from person to person and that only identical twins could have the same DNA profile.

Dr. Amy McMaster, an expert in forensic medicine, testified that she performed autopsies on Mr. Estfanous and Mr. Hanna. She said Mr. Estfanous had a large shotgun wound on his back and pistol wounds on his back and neck. She said that he died from the wounds minutes after being shot and that he did not have drugs or alcohol in his body. She recovered bullets from near Mr. Estfanous's spine and neck, shotgun wadding from his lung, and buckshot pellets from his flank, back, spine, and lung. She said that Mr. Hanna had a shotgun wound to his abdomen and that she recovered shotgun pellets, shotgun wadding, and glass from his body. She said that Mr. Hanna died from the shotgun wound, which caused damage to his heart, lungs, liver, and ribs, and that he did not have drugs or alcohol in his body. She took samples of Mr. Hanna's and Mr. Estfanous's blood and submitted the samples to the TBI for testing. On cross-examination, Dr. McMaster testified that although the victims' injuries would not have caused death instantly, the victims would not have lived for more than a few minutes, at most, after being shot.

Upon this evidence, the jury found the Defendant guilty of attempted especially aggravated robbery, attempted first degree murder, and two counts of felony murder. During the punishment phase of the trial, Adel Abdelmessih testified through an interpreter that he was Mr. Hanna's mother's uncle. He said that Mr. Hanna was like a son to him and that Mr. Hanna assisted him with his health problems. He said that Mr. Hanna's mother was admitted to a hospital after hearing that Mr. Hanna was killed and that the entire family was devastated by his death. He said Mr. Hanna assisted his family financially.

Eid Ghatas testified that he was Mr. Estfanous's cousin. He said that Mr. Estfanous supported his parents and siblings financially. He said that Mr. Estfanous's father collapsed and had a nervous breakdown after hearing that his son died and that the entire family was devastated.

William T. Robinson, Jr., testified for the defense that he taught the Defendant at the Institution of Learning Research, an alternative school for students with emotional and educational problems, when the Defendant was sixteen and seventeen years old. He said that the Defendant's parents did little to supervise the Defendant, that the Defendant was absent from school frequently, and that the Defendant often slept during class. He said that when the Defendant attended school, it was usually due to pressure from the Defendant's probation officer. He said that he questioned the Defendant's ability to think and reason and that the Defendant had a learning disability.

On cross-examination, Mr. Robinson testified that he did not know why the Defendant was sent to the alternative school or why he was on probation. He said he met the Defendant's mother one time at church and agreed she was supervising the Defendant at that time. On redirect examination, Mr. Robinson testified that the Defendant's mother did not attend the trial.

Dr. Geraldine Bishop, an expert in intellectual disabilities and developmental psychology, testified that she was a clinical and developmental psychologist and that she frequently worked with and performed assessments of mentally retarded persons.[1] She said untrained persons would often not immediately realize if a person were mildly retarded. She said persons suffering from mild mental retardation often do not know how to behave and will react impulsively when confronted with unfamiliar situations.

Dr. Bishop testified that she reviewed the Defendant's school records and that when he was in kindergarten, he was diagnosed as being mentally retarded and placed in special education classes. She said that the Defendant underwent regular psychological assessments during school and that he was found to be mildly retarded in each developmental category except physical development. She said the Defendant was mildly retarded academically, intellectually, and with regard to his adaptive behavior, which included how effectively a person could perform basic tasks and communicate.

---

[1]We note that on April 9, 2010, the General Assembly ordered all references to "mental retardation" in Tennessee Code Annotated to be changed to "intellectual disability." See 2010 Tenn. Pub. Acts 734. The testimony of witnesses is provided as given.

Dr. Bishop testified that she administered tests on the Defendant to determine his level of intelligence and adaptive behavior. She said the Defendant's full scale IQ was sixty-six, which was in the bottom one percent of the population. She said that his ability to make decisions and focus on complicated situations was impaired and that he probably did not have the ability to participate meaningfully in his own defense. She said the Defendant's adaptive behavior functioning was significantly impaired in the areas of communication, daily living, and socialization. She said over ninety-nine percent of the population had better adaptive behavior than the Defendant. She said that the Defendant was able to perform simple plans but that he would not know how to think and would react impulsively if something unexpected occurred. She said the Defendant's desire to be in the company of others may have caused him to ride to the scene of the robbery with his co-defendants.

On cross-examination, Dr. Bishop testified that she was hired to determine if the Defendant was mentally retarded. During her assessment of the Defendant, she spent about four or five hours with him, reviewed his school records, and spoke with his family. She agreed the last test administered to the Defendant while he was in school indicated that he had an IQ of seventy-seven and that although he was on the borderline of mental retardation, he was not mildly retarded. She said the increase in his IQ score could have been caused by medications he took at the time.

Dr. Bishop agreed that she was provided with information regarding the Defendant's criminal record. She was aware that in 2003, the Defendant went into an assistant principal's office and stole money from her purse and that the Defendant was also charged in 2003 for possessing a .32 caliber pistol, which he said he purchased from someone on the street for seventy-five dollars. She was not aware that the Defendant stole cars in 2004 and 2005 or that he provided the police with false names when he was arrested. She said mildly retarded persons could lie to protect themselves. She was not aware the Defendant informed the police that he bought the shotgun used to kill the victims from a man on the street or that he traded cocaine to obtain the car used during the robbery. She said mildly retarded people could negotiate for things and find a way to meet their needs. She was aware the Defendant wore a ski mask during the robbery and said the Defendant had the ability to plan things. She was not surprised that the Defendant disposed of the murder weapon or the car used during the robbery and said the Defendant was able to perform tasks to protect himself.

On redirect examination, Dr. Bishop testified that the Defendant's full scale IQ was measured to be sixty-two at age seven, sixty at ages eleven and twelve, and sixty-seven at age sixteen. She said his earlier evaluations were consistent with her findings of mild mental retardation.

Upon this evidence, the jury sentenced the Defendant to life imprisonment without the possibility of parole for each of the felony murder convictions. The trial court sentenced the Defendant to twenty years' confinement for attempted first degree murder and to ten years' confinement for attempted especially aggravated robbery. The attempted first degree murder conviction was ordered to be served consecutively to the remaining convictions, for an effective sentence of life plus twenty years. This appeal followed.

**I**

The Defendant contends that the trial court erred by denying his motion to redact a portion of the video evidence. He argues that the portion of the video depicting Mr. Hanna's intestines after he was shot in the stomach was not relevant to any contested issue at trial and that the probative value of this portion of the video was substantially outweighed by the danger of unfair prejudice. The State contends that the trial court properly denied the Defendant's motion and did not abuse its discretion. We agree with the State.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The trial court's decision to admit or exclude evidence will be overturned on appeal only when there has been an abuse of discretion. See State v. Samuel, 243 S.W.3d 592, 599 (Tenn. Crim. App. 2007).

In denying the Defendant's motion to redact the portion of the video evidence showing Mr. Hanna's intestines, the trial court noted that the images, "despite being somewhat inevitably gruesome, are not so graphic as to unnecessarily inflame any trier of fact of ordinary sensibility. The distance of the cameras from the victims and the relatively low resolution of the recording assist in abating the inherently horrific nature of this type of injury." The trial court found that the jury would be better informed as to the sequence of events if permitted to view the recording in its entirety and concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

We have viewed the surveillance video submitted at the trial. Although the angle produced from camera one shows the Defendant shoot Mr. Hanna in the stomach and Mr. Hanna convulse, Mr. Hanna's intestines are not clearly shown. The angles from camera three and camera five show Mr. Hanna's intestines protrude shortly after the Defendant shoots him in the stomach. We note that cameras three and five are the only cameras to capture footage

of the co-defendant shooting Mr. Rayburn and that although camera seven shows an obstructed view of the co-defendant standing behind the counter and the Defendant reaching over the counter, only footage from camera five clearly shows the Defendant and his co-defendant touching the cash register. The recordings have a relatively low resolution, and all of the cameras showing Mr. Hanna are mounted on the ceiling and are several feet from his body.

We agree with the trial court that the video evidence was relevant to inform the jury of the sequence of events and the Defendant's actions. The video shows Mr. Hanna and the other victims directly before, during, and after the Defendant's crimes. Despite the potential for prejudice, the footage showing Mr. Hanna's intestines is short in duration, and the protrusion is limited in size and is not particularly bloody or overly graphic considering the type of wound inflicted. We agree with the trial court that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice and conclude that the trial court did not abuse its discretion by admitting the video evidence. The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred by denying his motion to strike the State's notice of intent to seek a sentence of life imprisonment without the possibility of parole. He argues that such a sentence constitutes cruel and unusual punishment when imposed on a person who is intellectually disabled, as proscribed by the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution. The State argues that the trial court properly denied the Defendant's motion because there is no legal precedent to support the Defendant's argument. We agree with the State.

A defendant may not be sentenced to death if suffering from an intellectual disability at the time the first degree murder was committed. T.C.A. § 39-13-203(3)(b) (2010). Although the death penalty constitutes cruel and unusual punishment with regard to the intellectually disabled, no court in this state has ever held that a sentence of life imprisonment without the possibility of parole violates the Eighth Amendment to the United States Constitution or article I, section 16 of the Tennessee Constitution when applied to an intellectually disabled defendant. See Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001); see also Atkins v. Virginia, 536 U.S. 304 (2002).

In denying the Defendant's motion, the trial court stated:

> The Defendant admits that the existing statutory and caselaw offers no support for his contention, however, he

-12-

proposes that sentencing a mentally retarded person to prison for the remainder of his life qualifies as cruel and unusual punishment. While courts have held that the death penalty constitutes constitutionally impermissible punishment with regard to the mentally retarded, it has yet to be decided that life without parole is of such severity as to transgress the protective boundaries of the Eighth Amendment.

The Defendant argues that because the United States Supreme Court recently held that a sentence of life imprisonment without the possibility of parole constituted cruel and unusual punishment when applied to a juvenile offender convicted of a nonhomicide offense, the trial court should have come to a similar conclusion in this case and struck the State's notice of intent to seek a sentence of life imprisonment without the possibility of parole. See Graham v. Florida, __ U.S. __, 130 S.Ct. 2011 (2010). We disagree. Unlike the defendant in Graham, this case involves an adult Defendant convicted of murdering two unarmed persons during a botched robbery attempt. As noted above, nothing in our jurisprudence suggests that the Defendant's intellectual disability renders his sentence unconstitutional. We hold that the trial court did not err by denying the Defendant's motion. The Defendant is not entitled to relief.

## III

The Defendant contends that the trial court erred by denying his motion to strike the felony murder aggravating circumstance from the State's notice of intent to seek a sentence of life imprisonment without the possibility of parole. He contends that this aggravating factor was inappropriate because the State used identical proof to establish both the Defendant's guilt and the application of the aggravating factor. The State responds that the trial court properly denied the Defendant's motion because the felony murder aggravating circumstance can support a sentence of life imprisonment without the possibility of parole when a defendant is convicted of felony murder. We agree with the State.

A sentence of life imprisonment without the possibility of parole may be imposed if the State proves beyond a reasonable doubt that a murder was "knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any . . . robbery." T.C.A. § 39-13-204(i)(7) (2006) (amended 2008, 2009, 2010). The felony murder aggravating circumstance can be used to enhance a sentence to life imprisonment without parole when a defendant is convicted of felony murder. State v. Butler, 980 S.W.2d 359, 363 (Tenn. 1998). Tennessee Code Annotated section 39-13-204 "is unambiguous and contains no restriction upon the use of

an aggravating circumstance when the aggravator duplicates an element of the offense." Id.

Although the Defendant argues that the aggravating factor was inappropriate, he cites no legal authority to support his position and concedes that our courts have previously decided this issue against him. We conclude that the trial court did not err by denying the Defendant's motion. The Defendant is not entitled to relief.

## IV

The Defendant contends that the trial court erred by granting the State's request to augment the pattern jury instruction on the "heinous, atrocious, and cruel" aggravating circumstance. He argues that the trial court should not have informed the jury that the anticipation of physical harm constitutes mental torture because the additional instruction was not supported by the evidence, the instruction constituted an improper judicial comment on the evidence, and the pattern jury instruction fully and accurately defined the term "torture" without the additional instruction. The State contends that the trial court did not err by augmenting the pattern jury instruction with a clarifying statement of law. We conclude that although the trial court erred when giving the special instruction, the error was harmless in light of the whole record.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). Anything short of a complete charge denies the defendant his constitutional right to a trial by jury. See State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

When giving jury instructions, the trial court has a duty to define statutory terms containing a technical meaning. State v. Raines, 882 S.W.2d 376, 382-83 (Tenn. Crim. App. 1994). Torture is "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). Causing a victim to anticipate physical harm may constitute mental torture. See State v. Carter, 114 S.W.3d 895, 904-05 (Tenn. 2003); State v. Nesbit, 978 S.W.2d 872, 886-87 (Tenn. 1998).

The Tennessee Pattern Jury Instructions define torture using the definition stated in Williams but do not state what type of mental pain can constitute torture. See T.P.I.- Crim. 7.04(a) (10th ed. 2006). "The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001) (citing Chesapeake, O. & S.W.R. Co. v. Foster, 13 S.W. 694 (1890)).

During the punishment phase of the trial, the trial court instructed the jury that a sentence of life without the possibility of parole could be imposed if the State proved beyond a reasonable doubt that Mr. Hanna's murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death. The trial court defined torture as "the infliction of severe physical or mental pain upon the victims while he or she remains alive and conscious. Anticipation of physical harm to [one's] self or a loved one then constitutes mental torture." (Emphasis added.)

We conclude that the trial court made an incorrect statement of law when it gave the special instruction. If the jury determined that Mr. Hanna anticipated physical harm, the trial court's use of the word "then" effectively directed a verdict that the Defendant tortured Mr. Hanna. Although the anticipation of physical harm to one's self or a loved one may constitute mental torture under appropriate circumstances, it is not a foregone conclusion that mental torture is present every time a person anticipates harm before it occurs.

Having determined that the trial court erred when giving the special instruction regarding the "especially heinous, atrocious, or cruel" aggravating circumstance, we must determine the effect of that error. As noted above, if the jury determined that Mr. Hanna anticipated physical harm, the instruction effectively directed a verdict that the Defendant tortured Mr. Hanna. The jury's finding that the "especially heinous, atrocious, or cruel" aggravating factor applied was surely influenced by the trial court's instruction because the jury is presumed to have followed the instructions of the trial court. See State v. Reid, 164 S.W.3d 286, 346 (Tenn. 2005).

Despite the likelihood that the jury's finding was influenced by the erroneous instruction, a "final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b). In sentencing the Defendant to life imprisonment without the possibility of parole for the murder of Mr. Hanna, the jury found two aggravating circumstances applicable: the "especially heinous, atrocious, or cruel" aggravating circumstance and the felony murder aggravating circumstance. The jury could properly impose a sentence of life

imprisonment without the possibility of parole based on the felony murder aggravating circumstance alone, and it did so when sentencing the Defendant for the murder of Mr. Estfanous. See T.C.A. § 39-13-204(i). The record reflects no reason why the jury would have sentenced the Defendant differently for the murder of Mr. Hanna had they not been instructed on the additional aggravating circumstance or found it inapplicable. We conclude that although the trial court erred when giving the special instruction, this error was harmless and did not more probably than not affect the judgment or result in prejudice to the judicial process. The Defendant is not entitled to relief.

## V

The Defendant contends that the trial court erred by rejecting his requested sentencing instruction regarding the statutory mitigating circumstance that he acted under the substantial domination of another person. He argues that the instruction should have been given because he informed the police that the robbery was Mr. Robinson's idea and that he did not want to be involved but that he became involved after his mind went "blank." He also argues that the instruction was appropriate because the evidence showed that he was intellectually disabled and susceptible to domination by others. The State contends that the trial court did not err because no credible evidence supported the Defendant's claim that he was under the substantial domination of another person and because the evidence established that the Defendant freely and voluntarily engaged in the robbery. We conclude that the trial court did not err by rejecting the Defendant's requested sentencing instruction.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See Harris, 839 S.W.2d at 73. During the punishment phase of a first degree murder trial, the trial judge shall instruct the jury "to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing. . . ." T.C.A. § 39-13-204(e)(1).

The Defendant relies upon proof of his mental disability and his recorded statement to Detective Roland to support his claim that he was under the substantial domination of another person during the robbery. Although the Defendant told Detective Roland that robbing the store was Mr. Robinson's idea and initially told Mr. Robinson he did not want to be involved in the robbery, Detective Roland testified that Mr. Robinson was not involved in the robbery. He said Mr. Betts and Ms. Alderson admitted their involvement in the robbery. The indictment reflects that the Defendant, Mr. Betts, and Ms. Alderson, not Mr. Robinson, were charged with the crimes. The record reflects that Ms. Alderson was the other masked person involved in the robbery and that Mr. Betts drove the truck used during the attempted robbery. Furthermore, although Dr. Bishop testified that the Defendant's desire to be in the company of others may have caused him to ride to the site of the robbery with

his co-defendants and that the Defendant would react impulsively if something unexpected occurred, she did not testify that the Defendant was under the domination of anyone during the robbery. The record reflects that the person by whom the Defendant claims to have been controlled during the robbery was not involved with the crimes or indicted. No other evidence indicated that the Defendant was under the substantial domination of another person. We conclude that the evidence did not support the mitigating circumstance and that the trial court did not err by rejecting the Defendant's requested sentencing instruction. The Defendant is not entitled to relief.

## VI

The Defendant contends that his rights to due process and a fair trial were violated when the trial court failed to give the jury meaningful guidance or directions as to their deliberations during the punishment phase of the trial. He argues that the jury should have been instructed on how to weigh and consider the aggravating and mitigating circumstances, including an instruction that aggravating circumstances must outweigh mitigating factors in order to impose a sentence of life imprisonment without the possibility of parole. The State contends that the trial court's instructions complied with the requirements of law and that the instructions enabled the jury to weigh the evidence properly and determine an appropriate sentence. We agree with the State.

Tennessee Code Annotated section 39-13-207 controls the sentencing for first degree murder cases in which the State does not seek the death penalty, but is seeking life imprisonment without the possibility of parole as the maximum punishment, and states:

> The sentencing proceeding shall be conducted in accordance with the provisions of § 39-13-204, excluding references to the death penalty.
>
> (b) If the jury unanimously determines that no statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt . . . the court shall sentence the defendant to imprisonment for life.
>
> (c) If the jury unanimously determines that the state has proven beyond a reasonable doubt one (1) or more of the statutory aggravating circumstances set forth in § 39-13-204(i), the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or to imprisonment for life.

(d) The jury shall be instructed that, in imposing sentence, it
shall weigh and consider the statutory aggravating circumstance
or circumstances proven by the state beyond a reasonable doubt
and any mitigating circumstance or circumstances.

Tennessee Code Annotated section 39-13-204(f)(2) also states that if a jury unanimously determines that the State has proven one or more of the statutory aggravating circumstances beyond a reasonable doubt, the trial judge shall instruct the jury that when choosing between the sentences of imprisonment for life without the possibility of parole and imprisonment for life, the jury "shall weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances." Although a jury may not impose a sentence of death unless the State establishes that the aggravating factors outweigh any mitigating circumstances beyond a reasonable doubt, no such requirement or jury instruction is required when the death penalty is not sought. See T.C.A. § 39-13-204(g). The statute "directs that the jury must 'weigh and consider' the aggravating and mitigating circumstances but does not require the jury to determine that the aggravating circumstances outweigh the mitigating circumstances by any specific level of proof in order to impose a sentence of life imprisonment without the possibility of parole." State v. Guy, 165 S.W.3d 651, 663 (Tenn. Crim. App. 2004) (citing T.C.A.§ 39-13-204(f)(2)).

Before the jury began their deliberations, the trial court instructed the jury that the State alleged the felony murder aggravating circumstance with regard to Mr. Estfanous's murder, and the felony murder and "heinous, atrocious, or cruel" aggravating circumstances with regard to Mr. Hanna's murder. The trial court also instructed the jury that it should consider any mitigating circumstances raised by the evidence, including: (1) the capacity of the Defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect; (2) the Defendant lacked substantial judgment in committing the offense because of his youth; (3) the Defendant was mentally retarded; (4) the Defendant cooperated with the police by admitting his involvement; (5) the Defendant attended twenty schools while growing up; and (6) the Defendant did not receive the intervention or resources needed to assist his significant educational, personal, and family problems. The trial court also instructed the jury that

If you unanimously determine that a statutory aggravating
circumstance or circumstances have been proved by the State
beyond a reasonable doubt, you shall, in your considered
discretion, sentence the defendant either to imprisonment for life
without possibility of parole or to life imprisonment. In
choosing between the sentences . . . you shall weigh and

consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances.

The jury was instructed that it had to use its considered discretion and weigh and consider the aggravating and mitigating circumstances before imposing a sentence. The jury was not required to determine that the aggravating circumstances outweighed the mitigating circumstances by any specific level of proof in order to impose a sentence of life imprisonment without the possibility of parole. We conclude that the jury instructions met the requirements of Tennessee Code Annotated sections 39-13-204(f)(2) and 39-13-207 and that the jury was properly instructed with regard to their consideration of the aggravating and mitigating circumstances when determining an appropriate sentence. The Defendant is not entitled to relief.

## VII

The Defendant contends that the evidence was insufficient to establish the "heinous, atrocious, and cruel" aggravating circumstance as to Mr. Hanna because no evidence established that the Defendant tortured or inflicted serious physical abuse after he shot Mr. Hanna once. The State contends that the evidence was sufficient because it established that Mr. Hanna suffered the anticipation of death in the moments before he was shot and then suffered physical and emotional pain after he was shot. We hold that the evidence was not sufficient to support this aggravating circumstance.

"In determining whether the evidence supports a jury's finding of a statutory aggravating circumstance, the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000). A sentence of life imprisonment without the possibility of parole may be imposed if the State proves beyond a reasonable doubt that a murder was "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." T.C.A. § 39-13-204(i)(5). As noted above, torture is "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Williams, 690 S.W.2d at 529. Causing a victim to anticipate physical harm may constitute mental torture. See Carter, 114 S.W.3d at 904-05; Nesbit, 978 S.W.2d at 886-87. Serious physical abuse has been defined as follows:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death."

"Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed. 1990)).

The record reflects that after the Defendant shot Mr. Estfanous, the Defendant and his co-defendant spent a few seconds attempting to open the cash register before the Defendant turned to Mr. Hanna, fired his shotgun once, and ran from the store. Mr. Rayburn testified that after the Defendant shot Mr. Estfanous, either the Defendant or the other masked person stated that they would kill everyone in the store. The Defendant did not physically harm Mr. Hanna after firing the single shot. Although causing a victim to anticipate physical harm can constitute mental torture, we note that the cases in which our courts have concluded that mental torture was present did not involve a threat of harm quickly followed by a single fatal blow. See, e.g., Carter, 114 S.W.3d at 904 (finding mental torture applicable when the defendants broke into the victim's home at gunpoint, forced the victim in a closet before raping the victim's wife and ransacking their home, and then murdered the victim and his wife); Nesbit, 978 S.W.2d at 886-87 (finding mental torture applicable when the victim was burned and beaten over a six-hour time period in her own home while four of her young children were present); State v. Hodges, 944 S.W.2d 346, 357-58 (Tenn. 1997) (finding mental torture applicable when the victim was handcuffed, bound, and placed on a bed with a pillow over his head as the defendants ransacked his home, discussed whether they should kill the victim, and then suffocated the victim). Despite the fact that our courts have not expressly stated that the harm must be anticipated for any particular length of time, to find mental torture applicable in this case would render almost every fatal shooting quickly preceded by a physical threat to be torture. We hold that the evidence was not sufficient to support a finding that Mr. Hanna's murder involved torture or serious physical abuse beyond that necessary to produce death.

The Defendant argues that because the evidence was insufficient to support the "especially heinous, atrocious, or cruel" aggravating circumstance, his sentence on this conviction should be reduced from life imprisonment without the possibility of parole to life imprisonment. We disagree. In addition to this aggravating circumstance, the jury also found the felony murder aggravating circumstance applicable to the Defendant's conviction for murdering Mr. Hanna. As previously noted, a sentence of life imprisonment without the possibility of parole may be imposed if the State proves beyond a reasonable doubt that a murder was knowingly committed while the Defendant committed or attempted to commit a robbery. T.C.A. § 39-13-204(i)(7). It is not disputed that the Defendant murdered Mr. Hanna during the attempted commission of an especially aggravated robbery. We hold that

although the evidence was insufficient to support the "especially heinous, atrocious, or cruel" aggravating circumstance, a sentence of life imprisonment without the possibility of parole was properly imposed pursuant to the felony murder aggravating circumstance. The Defendant is not entitled to relief.

## VIII

The Defendant contends that the trial court erred by imposing partially consecutive sentences. He argues that consecutive sentences are improper because the court made no reference to any of the statutory factors upon which consecutive sentences may be imposed and a sentence of life imprisonment without the possibility of parole plus twenty years is not the least severe measure necessary to achieve the purposes for which the sentence was imposed. The State concedes that the trial court failed to state proper criteria under Tennessee Code Annotated section 40-35-115 (2010) to justify imposing consecutive sentences, but it contends that a partially consecutive sentence was proper because the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. We conclude that although the trial court failed to make the findings required by law to impose consecutive sentences, a partially consecutive sentence is appropriate.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment.  T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210 (2010).  From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'"  Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (2) The defendant is an offender whose record of criminal activity is extensive; or

. . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; or

 . . .

(6) The defendant is sentenced for an offense committed while on probation.

The imposition of consecutive sentences on an offender found to be a dangerous offender also requires "the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Only one of the criteria stated in Tennessee Code Annotated section 40-35-115 need exist to support consecutive sentencing. State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

After the jury sentenced the Defendant to life imprisonment without the possibility of parole for each of the felony murder convictions, the trial court held a separate sentencing hearing for the Defendant's attempted first degree murder and attempted especially aggravated robbery convictions. At the sentencing hearing, the State introduced the presentence report. In the report, the Defendant stated that he used marijuana and cocaine daily, beginning at the age of fifteen and continuing until the time of his incarceration. The Defendant also stated that he was expelled from McGavock High School for fighting. The report reflects that the Defendant has previous convictions for reckless driving, driving with a suspended license, criminal impersonation, theft of property valued at more than $500 but less than $1000, and casual exchange of drugs. After being convicted of theft of property on July 3, 2005, the Defendant was sentenced to eighteen months' probation. The presentence report reflects that the Defendant violated the terms of his probation twice and that he was on probation when he committed these felonies. The Defendant submitted documents listing the schools he attended and an assessment of his special needs and recommendations for treatment. The Defendant also apologized to the victims' families.

The trial court found that the following enhancement factors applied: (8) The Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; (10) The Defendant had no hesitation about committing a crime when the risk to human life was high; and (13) The Defendant was

released on probation at the time he committed these felonies. See T.C.A. § 40-35-114 (2010). The trial court found no mitigating factors applicable. In determining that the twenty-year sentence for attempted first degree murder should run consecutively to the sentences for felony murder, the trial court stated:

> I might also point out that the co-defendant in this matter has heretofore been sentenced to life imprisonment with 15 years consecutive. It is the opinion of this Court that [the Defendant] was in fact the leader of the crimes and that he did, in fact, commit those murders. He was the trigger man in those murders. Certainly his sentence should be in excess of the sentence that was received by the co-defendant. That's the judgment of the Court.

Although the trial court's finding that the Defendant was a leader in the commission of the offense could be used as an enhancement factor, it was not a proper factor under Tennessee Code Annotated section 40-35-115 to justify imposing consecutive sentences. See T.C.A. § 40-35-114, -115. The trial court's finding that he was the "triggerman" and deserved more punishment also was not a proper factor to justify imposing consecutive sentences. Despite the trial court's reliance on these improper criteria, we note that the trial court found as an enhancement factor that the Defendant was released on probation at the time he committed these felonies, a proper factor upon which the court could order the Defendant's sentences to run consecutively. See T.C.A. § 40-35-115(b)(6). The Defendant does not dispute that he was on probation at the time of the offenses. Furthermore, the record reflects that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, that an extended sentence is necessary to protect the public against further criminal conduct by the Defendant, and that consecutive sentences reasonably relate to the severity of the offenses committed. See Wilkerson, 905 S.W.2d at 939. The Defendant entered the store and murdered Mr. Estfanous almost immediately, before Mr. Estfanous could attempt to open the cash register. The Defendant proceeded, without provocation, to murder Mr. Hanna as he lay defenseless on the floor. The Defendant has multiple previous convictions and continued to violate the law when placed on probation. This evidence supports a finding that the criteria provided in Tennessee Code Annotated section 40-35-115(b)(4), -115(b)(6), and Wilkerson were applicable in the Defendant's case and that consecutive sentencing was proper.

With regard to the Defendant's claim that the sentence is not the least severe measure necessary to achieve the purposes for which his sentence was imposed, we note that the jury's sentencing the Defendant to life imprisonment without the possibility of parole reflects

that the sentence was imposed to ensure that the Defendant not be released from prison during his lifetime. A partially consecutive sentence furthers this purpose and ensures that the Defendant will not be released. We conclude that although the trial court failed to make the findings required by law to impose consecutive sentences, a partially consecutive sentence is appropriate. Furthermore, we hold that in light of the facts in this case, the Defendant's sentences were appropriate and that they were not imposed arbitrarily. See T.C.A. § 39-13-207(g).

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE